

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NJM:VAZ  
F. #2016R02063

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 2, 2022

By ECF and E-mail

The Honorable Nina R. Morrison  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

        Re:    United States v. Kyler Booker  
                  Criminal Docket No. 22-489 (NM)

Dear Judge Morrison:

        The government respectfully submits this letter in anticipation of the initial appearance and arraignment for the defendant Kyler Booker in the above-referenced matter. The defendant was arrested in Arkansas and is expected to appear at removal proceedings in the Eastern District of Arkansas later today. For the reasons stated below, the government seeks the defendant's pretrial detention.

        The defendant is a straw purchaser charged with firearms trafficking conspiracy, in violation of Title 18, United States Code, Section 371, and multiple counts of making false statements to acquire firearms, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). Straw purchasers may not lawfully buy guns from federally licensed dealers, such as gun stores, on behalf of third-party recipients. But the defendant has purchased at least 137 firearms at Arkansas gun stores from December 2019 to September 2021. During separate criminal investigations, law enforcement has recovered at least 13 of those firearms in New York City: nine in the Eastern District of New York and at least one in every borough. One of the firearms was loaded and in the possession of an individual in Queens, a mere 12 days after the defendant bought it in Sherwood, Arkansas.

        The defendant's repeated straw purchasing—despite a prior warning by agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")—shows that he is a danger to the community. For the reasons set forth below, the defendant should be held without bail pending trial.

I.   Background

   A.   The Defendant's Firearms Purchases

The defendant is not a federally licensed firearms importer, manufacturer or dealer.  But a review of ATF firearm-purchasing records shows that, from December 31, 2019, to September 1, 2021, the defendant has purchased at least 137 firearms across at least 26 separate transactions from multiple locations in Arkansas.  And the defendant falsely certified in ATF forms related to the purchases that he was the "actual transferee/buyer," when he in fact was a straw purchaser who sold the guns to others.  Many of those guns, as explained below, were funneled into New York City.

During the scheme, the defendant made what are called "multiple-sale transactions," in which a customer buys more than one firearm within a five-day period at the same location.  Certain types of multiple-sale transactions—in particular purchases of bulk quantities of certain firearms, such as pistols—are generally indicative that the firearms are being purchased for distribution, not personal use.

The defendant's pattern of firearms purchasing is strongly indicative of commercial, rather than personal, purchases.  For instance, during the approximately two-week period from October 29, 2020, to November 12, 2020, the defendant bought at least 56 firearms across eight transactions in three gun stores located in the Little Rock metropolitan area of Arkansas.  Those 56 firearms included 32 Taurus Armas S.A. ("Taurus") 9mm pistols; multiple 9mm pistols from Glock Ges.m.b.H ("Glock"), Smith & Wesson Brands, Inc. ("Smith & Wesson") and Stoeger, a United States-based brand of Beretta Holding S.A. ("Beretta"); and a Maverick Arms Inc. 12-gauge shotgun.

More generally, the defendant had at least 18 multiple-sale transactions from January 2020 to September 2021.  At least 86 firearms from those purchases were 9mm pistols.  The defendant continued making multiple-sale transactions even after ATF agents approached him on or about February 12, 2021, at which time the defendant signed a written warning acknowledging that he was told to discontinue engaging in firearms dealing without a license.

During the scheme, the defendant has received numerous phone calls, including those from New York-based telephone numbers, from individuals seeking to buy guns.  The defendant also communicated with customers by Facebook and other social media.  Facebook messages recovered from the defendant's account show numerous firearms-related communications.  For instance, during one Facebook conversation, Booker sent Individual-1, whose identity is known to law enforcement, the following five photographs:

2







After the defendant sent the photographs, the following conversation ensued:

> Individual-1: How much for one with the drum at the bottom? I want it!!
>
> Individual-1: And what's the handgun in bottom of the case picture?
>
> Defendant: Everybody want BIG thunder
>
> Defendant: Which one fam?
>
> Individual-1: Oh not for sale? Can you get me one like it?
>
> Defendant: Fo sho

The conversation occurred on March 10, 2021, 26 days after the defendant signed the written ATF warning.

    B.    <u>The Firearms Recovered in New York City</u>

        The New York City Police Department ("NYPD") has recovered at least 13 of the defendant's purchased firearms—all pistols—in the city's five boroughs. More of his guns are plausibly still out there. Ten of the 13 firearms were recovered with their serial numbers either obliterated or defaced, which makes firearms tracing difficult (suggesting that more of his firearms may have been recovered but may be untraceable). Eight of the 13 firearms were recovered in Brooklyn, two in Manhattan, one in the Bronx, one in Queens and one in Staten Island.

        Moreover, ATF can calculate the amount of time between retail sale of a firearm by a federal firearms licensee—the gun store—and the recovery of the firearm by law enforcement. The time period is known as "time to crime," law enforcement believes that a short time to crime (usually 180 days or less) is consistent with straw purchasing, because the firearm is transmitted outside of the custody of the purchaser too quickly for it not to have been the intention at the time of the purchase. Nine of the 13 recovered firearms had a time to crime of 180 days or less, and one of them was recovered only 12 days after purchase. See, e.g., <u>United States v. Rocha</u>, No. 19-CR-625 (GAF), 2019 WL 4384465, at *8 (N.D. Ill. Sept. 11, 2019) (noting that 12-day time to crime is "remarkably short").

        NYPD officers recovered the first of the defendant's recovered guns—a loaded Taurus G2C 9mm pistol—in the Far Rockaway neighborhood of Queens on or about November 10, 2020. For the weapon, Michael Phipps pleaded guilty to second-degree criminal possession of a loaded firearm, in violation of New York Penal Law section 265.03(3). See <u>People v. Phipps</u>, No. 1226-2020 (Queens Cty. Sup. Ct. Feb. 8, 2022). The defendant purchased the gun on or about October 29, 2020 in Sherwood, Arkansas.

        NYPD recovered the second gun—a loaded Smith & Wesson M&P Shield 9mm pistol—while executing a search warrant on an apartment in the Bedford-Stuyvesant neighborhood of Brooklyn on or about December 18, 2020. The defendant purchased the gun on or about October 7, 2020 in North Little Rock, Arkansas.

NYPD recovered the third gun—a loaded Glock 43 9mm pistol—from the back-seat area of a taxi in the East Flatbush neighborhood of Brooklyn on or about December 29, 2020, while Individual-2, a teenaged minor whose identity is known to law enforcement, was sitting in the back as a passenger. The defendant purchased the gun on or about October 1, 2020, in Little Rock, Arkansas.

NYPD recovered the fourth gun—a loaded Taurus G2C 9mm pistol—from a party bus in the Dumbo neighborhood of Brooklyn on or about February 12, 2021, after stopping the vehicle for traffic violations. The pistol was one of seven firearms recovered from that bus. The defendant purchased the gun on or about November 11, 2020, in Sherwood, Arkansas.

NYPD recovered the fifth gun—a loaded Smith & Wesson M&P Shield .40 pistol—from the person of Dior Francois in the Canarsie neighborhood of Brooklyn on or about March 10, 2021. Francois was later arrested for possessing a different weapon on January 17, 2022, and he was charged in state court with second-degree criminal possession of a loaded firearm with intent to use it against another, in violation of N.Y. Penal Law § 265.03(1)(b), and related counts. See People v. Francois, No. CR-1422-22KN (Kings Ct. Crim. Ct. filed Jan. 18, 2022). The defendant purchased the gun on or about December 20, 2020, in Benton, Arkansas.

NYPD recovered the sixth gun—a loaded Taurus G2C 9mm pistol—while executing a search warrant on an apartment in the Park Hill neighborhood of Staten Island on or about April 2, 2021. The defendant purchased the gun on or about November 9, 2020, in Benton, Arkansas.

NYPD recovered the seventh gun—a loaded Sturm, Ruger & Company, Inc. Security-9—from the person of Individual-3, a teenaged minor whose identity is known to law enforcement, in the Bedford-Stuyvesant neighborhood of Brooklyn on or about June 19, 2021. The defendant purchased the gun on or about January 17, 2021, in Little Rock, Arkansas.

NYPD recovered the eighth gun—a loaded Taurus G3C 9mm pistol—in the Harlem neighborhood of Manhattan on or about September 22, 2021. For the gun, three defendants—Aboubacar Dansoko, Ousseynou Diop and Sekou Kanoute—have been arrested and charged in state court with second-degree criminal possession of a loaded firearm with intent to use it against another, in violation of N.Y. Penal Law § 265.03(1)(b), and related counts, with trial currently scheduled to start next week. See People v. Dansoko et al., No. 2270-2021 (N.Y. Cty. Sup. Ct. filed Oct. 8, 2021). The defendant purchased the gun on or about December 6, 2020, in Benton, Arkansas.

NYPD recovered the ninth gun—a loaded Smith & Wesson M&P Shield .40 pistol—in the Crown Heights neighborhood of Brooklyn on or about October 20, 2021. For the gun, Grantley Mims has been arrested and charged in state court with second-degree criminal possession of a loaded firearm, in violation of N.Y. Penal Law § 265.03(3), and related counts. See People v. Mims, No. 70858-22 (Kings Cty. Sup. Ct. filed Mar. 16, 2022). The defendant purchased the gun on or about October 29, 2020, in Little Rock, Arkansas.

NYPD recovered the tenth gun—a Beretta Stoeger STR-9 9mm x 19 pistol with a shell casing in the chamber—on the street near Montefiore Medical Center in the Wakefield

neighborhood of the Bronx on or about November 18, 2021. The defendant purchased the gun on or about September 1, 2021—after the defendant had signed the written ATF warning—in Little Rock, Arkansas.

NYPD recovered the eleventh gun—a loaded Taurus G2C 9mm pistol—from the person of Jamel Carmichael in the Lindenwood neighborhood of Brooklyn on or about December 10, 2021. For the gun, Carmichael has been arrested and charged in state court with second-degree criminal possession of a loaded firearm, in violation of N.Y. Penal Law § 265.03(3), and related counts. See People v. Carmichael, No. 74212-21 (Kings Cty. Sup. Ct. filed Dec. 17, 2021). The defendant purchased the gun on or about November 8, 2020, in Benton, Arkansas.

NYPD recovered the twelfth gun—a loaded Taurus G2C 9mm pistol—while executing a search warrant of Jaime Brown's residence in the Harlem neighborhood of Manhattan on or about January 27, 2022. Brown was arrested that day following a state robbery investigation, and he has been charged with first-degree robbery while displaying a firearm, in violation of N.Y. Penal Law § 160.15(4), and related counts. See People v. Brown, No. 70311-22 (N.Y. Cty. Sup. Ct. filed Feb. 8, 2022). The defendant purchased the gun on or about September 1, 2021—after the defendant had signed the written ATF warning—in Little Rock, Arkansas.

NYPD recovered the thirteenth of the defendant's identified guns—a loaded Smith & Wesson M&P Shield .40 pistol—from Umajesty White's residence in the Brownsville neighborhood of Brooklyn on or about May 8, 2022. At the time, White was on parole after serving a three-year sentence for attempted second-degree burglary of a dwelling, in violation of N.Y. Penal Law §§ 140.25(2) and 110.00. The defendant purchased the relevant gun on or about December 20, 2020, in Benton, Arkansas.

II.   Legal Standards

At the government's request and "immediately upon the person's first appearance," this Court "shall hold" an adversarial detention hearing in any "case that involves," among other things, "any felony that is not otherwise a crime of violence . . . that involves the possession or use of a firearm." 18 U.S.C. § 3142(f)(1)(E). The Federal Rules of Evidence do not apply, and the government may proceed by proffer. See id. § 3142(f); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). Detention hearings are "typically informal affairs, not substitutes for trial and discovery." United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004) (quoting United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.)).

During the hearing, the Court must "determine whether any condition or combination of conditions" of release "will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). If no condition or conditions exist to reasonably protect against the defendant's flight risk and dangerousness, then the Court "shall order the detention of the person before trial," id. § 3142(e)(1), and issue "written findings of fact and a written statement of the reasons for the detention," id. § 3142(i)(1). In making the determination, the Court "shall . . . take into account

6

the available information concerning" (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a minor victim or a controlled substance"; (2) "the weight of evidence against the person"; (3) "the history and characteristics of the person," including "the person's character, . . . length of residence in the community, community ties, [and] past conduct"; and (4) "the nature and seriousness of the danger to any person or the community." Id. § 3142(g).

Dangerousness encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and other witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (citation omitted). This Court must find the facts supporting a finding of dangerousness by clear and convincing evidence. See 18 U.S.C. § 3142(f); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995).

III.  Argument

This Court should issue a permanent order of pretrial detention as to the defendant because no set of conditions will reasonably assure his appearance at judicial proceedings and the safety of other persons and the community. See 18 U.S.C. § 3142(e)(1).

A.  The Court Must Hold a Detention Hearing

The Court must hold a detention hearing under 18 U.S.C. § 3142(f) because the defendant has committed multiple felonies involving the possession or use of a firearm. Making false statements to acquire firearms plainly constitutes such a felony. See, e.g., United States v. Gaston, 2:21-CR-36 (JPK), 2021 WL 1170201, at *4 (N.D. Ind. Mar. 26, 2021); United States v. Whitlock, No. 11-CR-736 (LOA), 2011 WL 1843007, at *1 n.2 (D. Ariz. May 16, 2011). So too does participating in a § 371 firearms conspiracy. See, e.g., United States v. Vasquez-Cintron, No. 19-CR-685 (PAD), 2020 WL 1310540, at *2 (D.P.R. Mar. 17, 2020).

B.  The Defendant Poses a Danger to the Community

The record shows by clear and convincing evidence that the defendant is too dangerous to be released. See 18 U.S.C. § 3142(e)(1).

The § 3142(g) factors weigh in favor of detention. First, "any conduct involving a firearm is inherently concerning in terms of potential dangerousness." Gaston, 2021 WL 1170201, at *7; see also, e.g., Rocha, 2019 WL 4384465, at *4 (collecting cases and recognizing that "the communities are put at risk by the unlawful trafficking of firearms into the hands of unknown persons outside the regulatory framework (be it federal, state, or local) of firearms ownership and possession"); United States v. Tyson, No. 08-CR-43 (CVG), 2008 WL 4415298, at *3 (D.V.I. Sept. 23, 2008) ("The unlicensed dealing in firearms facilitates criminal access to guns and can increase violent crime. . . . If [the defendant is released on bail, he may continue to facilitate the influx of dangerous firearms into the community. Those weapons may end up hurting members of the community."). This case involves at least 137 firearms.

7

The defendant personally bought scores of weapons and misrepresented his status as the actual buyer to do so. The defendant gave his own personal information to licensed sellers so that the identities of his numerous customers could be protected. "The overall result of this circumventing of the legal and regulatory framework of firearm purchase and ownership is a diminution in the health, safety, and welfare of the public." Rocha, 2019 WL 4384465, at *6. The defendant knew to stop engaging in bulk purchases without a federal license and yet continued to do so, selling them to individuals on the phone. As shown by his Facebook messages ("Fo sho"), the defendant showed no hesitation to buy firearms for customers. See 18 U.S.C. § 3142(g)(3) (finding relevant "the history and characteristics of the person").

Those customers included an individual on parole for a violent crime, an individual who has been convicted of illegally possessing the relevant gun, and an alleged armed robber. Twelve of the 13 recovered firearms were loaded. The remaining gun apparently was shot (hence the shell casing in the chamber) and tossed by a hospital. One of the defendant's guns arrived in New York City—more than 1,000 miles away from Little Rock—in less than two weeks. And the recovered guns were all pistols, which are "small, easily concealed, and serious" and weigh in favor of detention. United States v. Lemoine, 450 F. Supp. 2d 99, 102 (D. Me. 2006).

The defendant's sentencing exposure also reflects the dangerousness of his conduct and weighs in favor of detention. See Vasquez-Cintron, 2020 WL 1310540, at *2. The defendant is charged with a firearms trafficking conspiracy count with a maximum sentence of five years and multiple false statement counts with a maximum sentence of 10 years each. Despite a lack of prior criminal history, the defendant's offense level under the United States Sentencing Guidelines ("Guidelines") is expected to be at least 34 (assuming no acceptance of responsibility)—which means a Guidelines range of 151 to 188 months' imprisonment and an effective Guidelines range of the statutory maximum for each count. In such circumstances, courts in this district have imposed consecutive sentences. See, e.g., United States v. Kapaev, 199 F.3d 596, 598 (2d Cir. 1999) (per curiam); see also U.S.S.G. § 5G1.2(d); United States v. Bloom, 366 F. App'x 285, 289 (2d Cir. 2010) (applying Kapaev after Guidelines were made advisory in United States v. Booker, 543 U.S. 220 (2005)).

The Court should also consider the legislative purpose underlying 18 U.S.C. § 3142(f)(1)(E), which requires this detention hearing. "Subsection (E) was enacted as part of the Adam Walsh Child Protection and Safety Act of 2006," a purpose of which "is '[t]o protect children from sexual exploitation and violent crime.'" United States v. Watkins, 940 F.3d 152, 166 (2d Cir. 2019) (quoting Pub. L. No. 109-248, 120 Stat. 587, 587 (2006)); see also id. (noting that statute "contemplated" risk of "employing firearms"). In this case, at least two of the defendant's purchased weapons were recovered near or on the person of a minor. This exposure of firearms to children is exactly the kind of dangerousness that fairly justifies pretrial detention.

Furthermore, many of the scores of the defendant's purchased firearms "remain unaccounted for" by law enforcement, which weighs heavily in favor of finding that releasing him "would jeopardize the safety of the public." United States v. Vick, No. 16-CR-10126 (ADB), 2017 WL 773860, at *2 (D. Mass. Feb. 28, 2017); accord United States v. Brown, – F. Supp. 3d –, No. 3:22-CR-33 (BJB), 2022 WL 1343302, at *8 (W.D. Ky. May 3, 2022).

The weight of evidence against the defendant also is overwhelming and demonstrates his dangerousness. See 18 U.S.C. § 3142(g)(2). The evidentiary record includes the lack of any federal firearms license, his social media communications with customers and the numerous ATF forms signed by him in which he falsely stated that he was the actual buyer. Financial records also support the defendant's statements that he resold his weapons to others.

Less restrictive conditions will not sufficiently mitigate the risk of dangerousness to New York City residents. Courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring. See, e.g., Millan, 4 F.3d at 1049 (reversing release after finding home detention and electronic monitoring insufficient to protect against defendants' dangerousness); United States v. Colombo, 777 F.2d 96, 97, 100 (2d Cir. 1985) (rejecting $500,000 bail package secured by real property); United States v. Cantarella, No. 02-CR-307 (NGG), 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's bail package" (collecting cases)); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility."); United States v. Masotto, 811 F. Supp. 878, 883 (E.D.N.Y. 1993) (rejecting bail because "in the case of 'dangerous defendants' the Bail Reform Act does not contemplate" conditions such as home confinement and location monitoring, "and that, even if it did, the conditions would not protect the community, given the ease with which many of them may be circumvented").

Therefore, the defendant should be detained because no set of release conditions will reasonably assure the safety of other persons and the community.

IV.   Conclusion

For the foregoing reasons, the government respectfully submits that the defendant should be held without bail until trial.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/ Victor Zapana
Victor Zapana
Assistant U.S. Attorney
(718) 254-7180

cc:   Clerk of the Court (NRM) (by ECF)

9